IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHAEL FARRIS,

    Plaintiff,

    v.

LABETTE COUNTY MEDICAL
CENTER,

    Defendant.

Case No. 2:19-cv-02060-HLT

## MEMORANDUM AND ORDER

Plaintiff Michael Farris worked as the medical director of the emergency department at Defendant Labette County Medical Center. He submitted a variance on February 17, 2017, and Defendant terminated his employment about a week later. Plaintiff contends his termination violates a Kansas statute, Kansas public policy, and the Emergency Medical Treatment and Labor Act ("EMTALA"). Defendant contends it terminated his employment after learning that Plaintiff had choked two nurses. It also counterclaims for breach of fiduciary duty.

Defendant moves for summary judgment on all Plaintiff's claims. The Court grants the motion on the EMTALA claim because Plaintiff has not shown a triable fact on whether he engaged in protected conduct under that statute. Because EMTALA was the hook for federal jurisdiction and all remaining claims arise under state law, the Court declines to exercise supplemental jurisdiction and dismisses those claims without prejudice.

**I.    BACKGROUND**[1]

Defendant employed Plaintiff from 2005 until 2017. This case stems from his termination on February 24, 2017, and centers on two disputes between the parties that occurred that month.

**A.    Variance Submitted by Plaintiff**

The first dispute relates to the care of a patient who visited Defendant's emergency department three times in early 2017. The parties dispute whether the patient was properly treated. Plaintiff treated the patient on her first two visits. Dr. Melinda Allen treated the patient on her third visit, which was on February 16, 2017, for a neck fracture. Dr. Allen texted Plaintiff after treating the patient and stated: "FYI we were advised of that c1 fracture by kenkel 2 days ago and did nothing."

The next day Plaintiff submitted a "variance" through Defendant's electronic reporting software. The variance involved the patient with the neck injury and stated: "Brian Williams was calling neurosurgeon and then giving nurses orders about applying cervical collars. He has no authority to be giving medical orders to nurses." Under "incident details," the variance states "Attempting to practice medicine without a licen[se]." Doc. 99-8. Williams is Defendant's CEO and is not a licensed medical provider. Williams had met with the patient and her family, discussed the patient with an outside neurosurgeon, and spoke with the nurses about the appropriate cervical collar to use.

Plaintiff submitted the variance after receiving a report from Nurse Cathy Cook. But he did not speak to Dr. Allen or the treating nurse before submitting it. The variance was received by the Chief Nursing Officer and Director of Risk Management, Kathi McKinney. McKinney asked the

---

[1]    In keeping with the standard for evaluating summary-judgment motions, the Court considers the following undisputed facts necessary to resolving the issues discussed in this order. Additional facts will be discussed in the analysis as needed.

2

treating nurse, "who ordered the C-Collar," and the nurse said Dr. Allen. McKinney then closed the investigation into the variance and concluded Plaintiff had no basis to file it. McKinney did not speak to Plaintiff about it.

The patient was ultimately screened and stabilized by Dr. Allen before being transferred to another facility. On February 18, 2017, Plaintiff texted Dr. Allen that he "varianced Brian for attempting to practice medicine without a license for how he overstepped his bounds on Thursday. I'm very tired of his meddling shit and I'm making an issue of what he did that day."

### B. Misconduct Allegations Against Plaintiff

The second dispute relates to allegations of misconduct against Plaintiff. Before February 2017, Plaintiff had never been disciplined by the state board of healing arts and there were no complaints about misconduct in his human resources file. But on February 21, 2017, Williams received a complaint about Plaintiff from Nurse Theresa Saye, which he referred to human resources. When human resources interviewed Saye, Saye reported that Plaintiff had choked her with a stethoscope. Plaintiff admitted he placed a stethoscope around Saye's neck but characterized it as "horseplay." Human resources also spoke with former nurse Iris Corwin, who alleged that Plaintiff choked her with a stylus cord. Corwin produced photographs that she said showed what the cord did to her neck.[2] Plaintiff admitted that he placed things, including a stylus cord, around Corwin's neck but considered it "horseplay." There were also reports that Plaintiff tied at least one person to a rolling chair with a gait belt. It's not clear when these incidents occurred. Human

---

[2] Plaintiff objects to these allegations as hearsay. While it is possible that the support cited in the motion may invoke hearsay or some other evidentiary objection, the Court is not convinced that the content or substance of this information would not be admissible in some other form at trial. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010). Plaintiff also contends that the photos are not authenticated and may have been altered, though he offers no evidence of alteration other than side-by-side comparisons of the photos, which generally show the same thing. The Court further notes that, although it provides these facts for background, the objected-to facts are not ultimately relevant to the analysis in this order, as discussed below.

resources ultimately collected several pages of notes from hospital staff about Plaintiff, which included both positive and negative statements about Plaintiff's interactions with staff and patients.

### C. Plaintiff's Termination

Defendant terminated Plaintiff's employment on February 24, 2017. A letter from Williams to Plaintiff states that Plaintiff was terminated for "pervasive and systematic physical assault and battery (including photographs of the results), verbal harassment, and intimidation of employees, as reported by current and former employees and medical staff members." Doc. 94-4 at 26. It also noted "consistently unacceptable behavior towards patients and families." *Id.*

## II.  STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.  ANALYSIS

Three claims remain in this case. Count II alleges wrongful discharge under Kansas law in violation of K.S.A. § 65-4928. Count III alleges wrongful discharge under Kansas law in violation of public policy. And Count VI alleges wrongful discharge in violation of EMTALA. *See* Doc. 92

at 2, 7-8. Defendant moves for summary judgment on all three claims. Defendant asserts a counterclaim against Plaintiff for breach of fiduciary duty, which is also governed by state law. *Id.* at 2, 10. But Plaintiff has not moved for summary judgment on that claim.

Count VI is the only remaining claim that arises under federal law. The Court starts with that claim.[3]

### A.     Plaintiff cannot establish a prima facie case of retaliation under EMTALA

In Count VI, Plaintiff alleges he was wrongfully terminated for reporting an EMTALA violation, 42 U.S.C. § 1395dd. Doc. 92 at 8. EMTALA states that "if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a).

Congress enacted EMTALA to address the issue of hospitals "dumping" patients with emergency conditions before they are appropriately examined and stabilized for the purpose of minimizing costs. *See Genova v. Banner Health*, 734 F.3d 1095, 1097 (10th Cir. 2013). EMTALA imposes two obligations on hospitals: (1) the hospital must examine everyone who comes to the emergency room seeking treatment, and (2) if the patient is suffering from an emergency medical condition, the hospital must stabilize the patient before attempting to transfer them. *Id.*; *see also* 42 U.S.C. § 1395dd(b)-(c). "[T]he basic statutory point is plain: a patient requiring emergency care

---

[3] The pretrial order states that subject-matter jurisdiction exists under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1343 (civil rights and elective franchise). Doc. 92 at 1. But it is not clear which claim, if any, would be governed by 28 U.S.C. § 1343. *See also Greene v. Inglewood Hous. Auth.*, 689 F. App'x 612, 612 (10th Cir. 2017) (noting that federal courts have a duty to determine whether subject-matter jurisdiction exists even if no party challenges it).

5

may not be dumped on another hospital when there is no medical justification for doing so." *Genova*, 734 F.3d at 1097.

EMTALA contains whistleblower protections. *See* 42 U.S.C. § 1395dd(i). That provision states that a "participating hospital may not penalize or take adverse action . . . against any hospital employee because the employee reports a violation of a requirement of this section." *Id.*[4] Courts have applied the *McDonnell Douglas* burden-shifting test to EMTALA retaliation claims. *Gillispie v. RegionalCare Hosp. Partners Inc*, 892 F.3d 585, 592-93 (3d Cir. 2018).[5] This burden-shifting test requires a plaintiff to first establish a prima facie case of retaliation by showing: (1) he engaged in conduct protected by EMTALA; (2) the defendant took adverse employment action against him; and (3) the defendant did so because he engaged in protected activity. *Id.* at 593. The plaintiff does not need to prove an actual EMTALA violation, but he must prove that he was acting under a good-faith belief that a violation existed. *Id.*

Defendant argues that Plaintiff cannot make out a prima facie case of retaliation under EMTALA because the variance did not state an EMTALA violation, EMTALA does not apply to interference with stabilization or transfer, and it is undisputed that the patient was appropriately

---

[4] The Tenth Circuit has assumed without deciding that EMTALA's retaliation protection applies when whistleblowers make reports to supervisors, as opposed to government authorities. *Genova*, 734 F.3d at 1101 n.2. The Court will assume likewise in this case.

[5] Plaintiff argues that the *McDonnell Douglas* framework does not apply because there is direct evidence of retaliation. Doc. 99 at 33-34. He bases this on his circular conclusion that "the direct evidence of retaliation is the fact that Dr. Farris was investigated and fired because he submitted a variance involving Labette's CEO." *Id.* at 33 (emphasis in original). But it is undisputed that Plaintiff's termination letter cited his "pattern of outrageous conduct," including allegations of assault and battery against staff. Doc. 94-4 at 26; *see also* Doc. 99 at 28 (admitting content of termination letter). The only other alleged direct evidence of retaliation cited by Plaintiff is his previously good employment record, the timing of his termination, alleged failings of the investigation that led to his termination, and statements made by Williams during the investigation. But this isn't direct evidence of retaliation—it is a classic argument of pretext, i.e., evidence that calls into question whether the stated reason for termination is in fact the real reason. Accordingly, the Court proceeds under the *McDonnell Douglas* framework because Plaintiff lacks direct evidence of EMTALA retaliation. *See Fischer v. Forestwood Co.*, 525 F.3d 972, 982 (10th Cir. 2008) ("If the plaintiff only produces circumstantial evidence, it is evaluated under the *McDonnell Douglas* burden-shifting framework."); *cf. Barrett v. Salt Lake City*, 754 F.3d 864, 867 (10th Cir. 2014) (declining to apply *McDonnell Douglas* framework only because it does not apply to post-trial motion practice).

screened, treated, and transferred only after stabilization. Doc. 94 at 27-30. Plaintiff contends that EMTALA's screening requirements are violated when a hospital fails to follow its own policies. Because Defendant's policy only allows "Qualified Medical Personnel" to screen patients, Plaintiff argues that Defendant violated EMTALA when Williams, who is not a licensed medical provider, "entered the ED and evaluated a patient <u>after</u> the attending physician did" and attempted to influence the attending physician's orders and then attempted to influence or change the transfer location. Doc. 99 at 40-43. The Court agrees with Defendant that Plaintiff has not shown a prima facie case of retaliation under EMTALA for four reasons.

First, the act of whistleblowing at issue is the variance. But the variance does not mention EMTALA and cannot be reasonably read to report an EMTALA violation. The variance submitted by Plaintiff on February 17, 2017, stated that "Brian Williams was calling neurosurgeon and then giving nurses orders about applying cervical collars. He has no authority to be giving medical orders to nurses." Doc. 99-8. The only other allegation is "Attempting to practice medicine without a licen[se]." *Id.* Nothing is said about EMTALA. And, more importantly, nothing in the variance suggests a failure to screen the patient or a failure to stabilize the patient before transfer, which are the only two requirements of EMTALA. *See Genova*, 734 F.3d at 1097. Nor has Plaintiff pointed to any evidence that he had a good-faith belief that an EMTALA violation occurred. The variance itself notes the patient <u>was</u> examined. Doc. 99-8. And it is undisputed that Plaintiff told Dr. Allen that he "varianced Brian for attempting to practice medicine without a license" and that he was "very tired of his meddling shit." Under these facts, no reasonable jury could conclude that the variance was alleging an EMTALA violation.

Second, EMTALA does not extend to Plaintiff's allegations of "attempted" interference with the stabilizing treatment ordered by Dr. Allen even if such allegations could be inferred from

7

the variance. Plaintiff attempts to support this claim by pointing to Williams's deposition testimony that Williams went into the patient's room, saw that she had a soft collar on, and was told that Dr. Allen had ordered the soft collar. Williams testified that he then had a conversation with the nurse and "said I cannot legally give you an order. Can you confirm that what Doctor Strang recommended as a Board Certified neurosurgeon, the Miami J Collar, that that was relayed to Dr. Allen." *See* Doc. 99 at 42.

To the extent Williams's testimony that he questioned nurses but told them that he "cannot legally give you an order" amounts to attempted interference, this is not the type of conduct EMTALA addresses. Importantly, Plaintiff does not argue that Williams's conduct <u>actually</u> prevented a patient from being screened or stabilized (discussed further below), only that he "attempted" to "interfere" with this process. The Tenth Circuit has specifically rejected reports of <u>potential</u> EMTALA violations as protected conduct. *Genova*, 734 F.3d at 1099 (rejecting interpretation of "EMTALA as affording damages to anyone who is retaliated against for reporting imminent but as-yet unrealized statutory violations of any kind"). Equally unpersuasive is Plaintiff's argument that Williams attempted to interfere or change the transfer location for the patient. Doc. 99 at 42-43.[6] EMTALA only prohibits patient "dumping," which Plaintiff admits did not occur, as discussed below.

Third, it is undisputed based on <u>Plaintiff's deposition testimony</u> that the patient was appropriately screened and stabilized by the treating physician Dr. Allen before being transferred, and that the patient was not "dumped":

> Q. You would agree that the patient was screened by Dr. Allen?
> A. Correct.

---

[6] Plaintiff's brief doesn't cite to any facts in arguing that Williams actually interfered with the transfer of the patient. In response to Defendant's statement of facts, Plaintiff alleges that Williams advised the patient's family to bypass a closer neurological facility to go to a Springfield facility where Williams had a financial interest. Doc. 99 at 13. But the cited testimony does not support this. *See* Doc. 99-29 at 14-16.

8

>	Q.	Appropriately?
>	A.	Correct.
>	Q.	The transfer occurred?
>	A.	The transfer did occur.
>	Q.	Okay. And the patient was stabilized before transfer?
>	A.	Correct.
>	Q.	And the patient was not dumped, was not refused treatment?
>	A.	Correct.

Doc. 94-1 at 26; *see also* Doc. 101 at 10-11. The fact that the patient was appropriately screened, stabilized before transfer, and not "dumped" satisfies EMTALA. *See Genova*, 734 F.3d at 1097. Plaintiff attempts to dispute this fact, but only based on William's attempted interference, *see* Doc. 99 at 16-17, which is not sufficient to state an EMTALA violation as explained above.

Fourth, there is no EMTALA violation based on Defendant's policy that required screening by "Qualified Medical Personnel." Plaintiff premises this argument on the fact that EMTALA's screening requirement is hospital specific. *See Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994). The Tenth Circuit has stated that "a hospital violates section 1395dd(a) when it does not follow its own standard procedures." *Id.* Because Defendant's policy requires screening by a medical provider, Plaintiff argues that Defendant violated its EMTALA policy when Williams performed a medical screening examination. Doc. 99 at 41.

But even assuming that the variance could be read to tie William's alleged unauthorized practice of medicine to an EMTALA violation—which is dubious, as discussed above—this argument ignores that the fact that, regardless of what Williams allegedly did, the patient was <u>also</u> screened and treated by Dr. Allen, the attending physician. Plaintiff's argument on this point admits as much. *See* Doc. 99 at 41 ("Relevant to Dr. Farris' variance, Williams entered the ED and evaluated a patient <u>after</u> the attending physician did. This was before Dr. Allen's ordered stabilizing treatment was administered." (emphasis in original)). Plaintiff does not dispute that Dr. Allen was "qualified medical personnel." Defendant's EMTALA policy was thus satisfied.

And even to the extent Williams's conduct was a deviation from policy, the Tenth Circuit has recognized that "any slight deviation by a hospital from its standard screening policy" does not automatically violate EMTALA. *See Repp*, 43 F.3d at 523 ("Mere de minimus variations from the hospital's standard procedures do not amount to a violation of hospital policy."). "To hold otherwise would impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed." *Id.* Thus, there cannot be an EMTALA violation regardless of Williams's conduct, where Dr. Allen otherwise satisfied the policy.

Based on this, no reasonable jury could conclude that Plaintiff engaged in conduct protected by EMTALA. His variance does not mention EMTALA, nor does it mention conduct covered by EMTALA, and there is no evidence that Plaintiff had a good-faith belief to the contrary. Accordingly, he has not shown a prima facie case of retaliation under EMTALA, and Defendant is entitled to summary judgment on Count VI.

### B. The Court declines to exercise supplemental jurisdiction over the remaining state-law claims

As noted above, the remaining claims in this case all arise under state law. Under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." But a court may decline supplemental jurisdiction if an exception under 28 U.S.C. § 1367(c) applies. *Gudenkauf v. Stauffer Commc'ns, Inc.*, 896 F. Supp. 1082, 1084 (D. Kan. 1995). One of those exceptions is when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In deciding whether to exercise supplemental jurisdiction, a court also considers judicial economy, convenience, and fairness. *Wittner v. Banner Health*, 720 F.3d 770, 781 (10th

Cir. 2013). Declining supplemental jurisdiction is a matter within a court's discretion. *See Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009).

The Court finds that Defendant is entitled to summary judgment on the only federal claim. All that remains are Plaintiff's two state-law retaliation claims and Defendant's state-law counterclaim. These claims are better resolved by the state court. Based on this consideration and the other considerations outlined above, the Court declines to continue exercising supplemental jurisdiction over these claims and dismisses them without prejudice. The Court does not reach the merits of any of the remaining state-law claims.

## IV. CONCLUSION

THE COURT THEREFORE ORDERS that Defendant's Motion for Summary Judgment (Doc. 93) is GRANTED IN PART. The Court grants Defendant summary judgment on Count VI, retaliation under EMTALA. The Court does not reach the other arguments raised in the motion.

THE COURT FURTHER ORDERS that the remaining claims in this case are DISMISSED WITHOUT PREJUDICE for lack of subject-matter jurisdiction.

THE COURT FURTHER ORDERS that Defendant's Motion to Exclude Expert Testimony (Doc. 97) is DENIED AS MOOT and WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: December 21, 2021              /s/ *Holly L. Teeter*
                                                         HOLLY L. TEETER
                                                         UNITED STATES DISTRICT JUDGE